UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

LINDA MARTIN,                              )
                                           )
            Plaintiff,                     )
                                           )
      vs.                                  )      Case No.  4:16-CV-00079 PLC
                                           )
NANCY A. BERRYHILL,[1]                     )
Acting Commissioner of Social Security,    )
                                           )
            Defendant.                     )

MEMORANDUM AND ORDER

Linda Martin (Plaintiff) seeks review of the decision of the Social Security

Commissioner, Nancy Berryhill, denying her applications for Disability Insurance Benefits and

Supplemental Security Income under the Social Security Act. Because the Court finds that

substantial evidence supports the decision to deny benefits, the Court affirms the denial of

Plaintiff's applications.[2]

*I. Background and Procedural History*

On May 21, 2013 and June 6, 2013, Plaintiff completed applications for Disability

Insurance Benefits and Supplemental Security Income.[3] (Tr. 285-91, 292-97). These claims were

based on the following medical conditions with an alleged onset date of October 24, 2012:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 10).
[3] The Social Security Administration denied Plaintiff's previous applications for Disability Insurance Benefits and Supplemental Security Income on July 10, 2010. (Tr. 182).

degenerative bone disease, back injury, arthritis, hernia, seizures, sinus problems, posttraumatic stress disorder, depression, and borderline personality disorder. (Tr. 313-14). The Social Security Administration (SSA) denied Plaintiff's claims on October 30, 2013, and Plaintiff filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 217-18, 359). The SSA granted the request and held a hearing on May 7, 2014. (Tr. 129-80, 227).

In his July 24, 2014 decision, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from October 24, 2012, through the date of this decision[.]" (Tr. 124). Subsequent to the ALJ's decision, Plaintiff presented to the SSA Appeals Council several medical records from examinations that occurred after the ALJ issued his decision. (Tr. 8-105). The Appeals Council reviewed the records and concluded that the new information did not pertain to the relevant time period. (Id. at 2). Therefore, the Appeals Council found the post-ALJ decision evidence did "not affect the decision about whether [she was] disabled beginning on or before July 24, 2014," and the Appeals Council denied Plaintiff's request for review. (Id.). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. The Administrative Proceeding

### A. Testimony at Hearing

On May 7, 2014, Plaintiff appeared with counsel at an administrative hearing. (Tr. 129). Plaintiff testified that she was fifty-two years old, five feet five inches tall, 160 pounds, and right-handed. (Tr. 134-35). She further testified that she left high school after completing her junior year, but later earned a GED and a certificate in "secretarial and business." (Tr. 136). Plaintiff stated she most recently worked at a cash register and stocked shelves at a store. (Id.).

She had been performing this work between eighteen and thirty hours per week "for a couple months," before she sustained a work-related injury on October 24, 2012. She had not looked for any work since sustaining the work-related injury. (Tr. 137-38). Plaintiff testified that, prior to working at the store, she was periodically employed with cleaning companies over a span of thirty years. (Id.).

Plaintiff stated that she suffered from a seizure disorder, high blood pressure, arthritis and cramps in the right hand, "a little" arthritis in the left hand, lumbar back pain stemming from degenerative bone deterioration, "sinosis [PHONETIC], psychotic [PHONETIC] nerve damage, [and] bulging discs." (Tr. 138-39). She also suffered: migraine headaches, which lasted half a day and occurred four to five times per month; pain in her neck, shoulders, and hands; lower back pain that felt like someone was "breaking my back or punching me"; and leg pain when walking. (Tr. 164-66). Plaintiff estimated that she could lift less than four pounds, walk for one ten-minute period per day, stand for one ten-minute period per day, and sit in a chair for ten to fifteen minutes per day. (Tr. 167-68). Plaintiff testified she did not drive because she did not have a license and her seizure disorder prevented it, but if she did, she would have problems steering a car and controlling the foot pedals. (Tr. 135, 168-69).

Plaintiff testified that she had a referral for, but had not yet seen, a pain management specialist for her back. (Tr. 142). The only specialist Plaintiff had seen for her back injury was at a Concentra Clinic about one year prior to the hearing. (Tr. 142-43). Plaintiff stated this visit was arranged "through worker's comp[ensation]" after the October 2012 work-related injury. (Id.). The doctor performed an MRI, and Plaintiff completed several months of physical therapy, which Plaintiff stated did not help the pain. (Tr. 144). Plaintiff also saw a general practitioner approximately every two months who prescribed her medications, checked her blood pressure,

and referred her to the pain management specialist. (Tr. 141-42). None of Plaintiff's doctors placed restrictions on her activities. (Tr. 146).

At the time of the hearing, Plaintiff was taking medication for high blood pressure, "Pantropozol [PHONETIC] sodium, Norvac [PHONETIC], Proloprosine [PHONETIC]," Tramadol, and Amotrax." (Tr. 147-48). Plaintiff testified that she began taking Amotrax after her last seizure to help prevent migraines. (Id.). Plaintiff stated the medications caused her to suffer constant fatigue, nausea, and "shakes[.]" (Tr. 149). Plaintiff also testified that she had not used marijuana or cocaine since the age of twenty, but had occasionally taken a friend's prescription pills about one year prior to the hearing. (Tr. 170-72).

On a typical day, Plaintiff awakened between 7:00 a.m. and 9:00 a.m., ate, took her medications, and spent the rest of her morning in bed. (Tr. 150-51). After lunch, Plaintiff usually returned to her bed, where she read or watched television until her boyfriend returned from work around 6:00 p.m. (Tr. 155). The two ate dinner, and Plaintiff tried to sit in a chair as long as possible before her back pain forced her back to bed. (Tr.155-56). Some days, Plaintiff's boyfriend dropped her off at her mother's house on his way to work, and she would visit with her mother and watch television until her boyfriend picked her up around 6:00 p.m. (Tr. 154).

Plaintiff testified that washing dishes was difficult because her hand hurt "really bad and start[ed] cramping." (Tr. 151). She stated she could manage small loads of laundry by herself, vacuum with her left hand, and go to the grocery store with someone else and lean on the cart. (Id.). Plaintiff's exercise regimen consisted of yoga and stretching. (Tr. 158). Plaintiff also testified that she was able to take five-minute showers, wash her hair, and dress herself sitting on the bed. (Tr. 156).

A vocational expert, Tim Shaner, also testified at the hearing. (Tr. 176). Mr. Shaner stated that both of Plaintiff's past jobs, cleaner and cashier, were classified as unskilled, and "light exertion, both generally and as performed." (Tr. 177). The ALJ asked Mr. Shaner to consider a hypothetical individual:

> limited to light work that can be learned in 30 days or less. Only frequently climb ramps and stairs. Occasionally stoop, kneel, crouch, and crawl. Never climb ladders, ropes, or scaffolds, or balance. Must avoid concentrated exposure to loud noise, vibration, and hazards.

(Id.). Mr. Shaner testified that such an individual would be able to perform both of Plaintiff's past jobs. (Id.). When the ALJ added to the hypothetical "only occasional contact with the general public," "no more than occasional changes in the work environment," and no "strict production pace rate[,]" Mr. Shaner ruled out the job of cashier. (Tr.177-78).

### B. Relevant Medical Records

Dr. Asif Qaisrani, a psychiatrist, treated Plaintiff from July 2011 until July 2012. (Tr. 385-98). In July 2011, Dr. Qaisrani noted that Plaintiff was a "questionably reliable" historian. (Tr. 391). Dr. Qaisrani diagnosed Plaintiff with cocaine dependence in remission, post-traumatic stress disorder, borderline personality disorder, and a chronic backache. (Tr. 393). At an appointment with Dr. Qaisrani in September 2011, Plaintiff complained of "severe back pain" but Dr. Qaisrani noted "steady gait and relaxed posture [.]" (Tr. 395).

In December 2012, Plaintiff visited her primary care physician, Dr. Jacquelyn McFadden. (Tr. 424). A musculoskeletal exam demonstrated "normal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Tr. 426). On January 11, 2013, Plaintiff underwent an MRI which showed: "grade I anterior degenerative listhesis of L4 on L5; central and lateral stenosis at the lower two levels, most marked at L4-5 where there is severe central and lateral stenosis; and no large focal disc herniation identified." (Tr. 411).

In July 2013, Dr. Eli Shuter examined Plaintiff at St. Louis Connect Care. (445-49). Plaintiff complained of migraine headaches. (Tr. 445). Dr. Shuter's musculoskeletal exam showed no myalgias or arthralgias, no abnormalities on the tandem gait test, and normal arm swing. (Tr. 447-48). Plaintiff also visited Dr. McFadden complaining of facial pain and seizures. (Tr. 416-19). Dr. McFadden noted neck stiffness and that Plaintiff had not fallen in the last year. (Tr. 417-18).

In August 2013, Plaintiff presented to an emergency room with chest pain. (Tr. 461). She did not complain of back or leg pain. (Id.). Her musculoskeletal exam revealed a normal range of motion. (Id.). After a chest X-ray, electrocardiogram, and blood work, Dr. Rosemary Wensely treated Plaintiff with a "GI cocktail," which relieved the symptoms. (Tr. 465).

In October 2013, Dr. Leslie Tharenos completed a consultative exam at the request of the SSA. (Tr. 474-83). Dr. Tharenos noted normal gait "and station" and no use of an assistive device for ambulation. (Tr. 477). Plaintiff was able to heel and toe walk, get off the exam table, move around the room, and squat while holding the exam table "without apparent difficulty[.]" (Tr. 477). Plaintiff had decreased range of motion of the lumbosacral spine and "demonstrate[d] tenderness to superficial palpation of the paraspinal musculature in this region." (Id.). Plaintiff exhibited normal fine and dexterous finger control, but there was "evidence of prior fingertip amputation of the left index, long and right fingers." (Id.). Plaintiff had bilateral wrist and hand arthralgias and a decreased range of motion in both wrists and hands. (Id.). An x-ray of the right hand and wrist exposed "slight narrowing, distal radial navicular joint space." (Tr. 480).

Plaintiff had no difficulty performing a variety of tasks with her right hand, including opening doors, using a knob, picking up and holding a cup, and tying shoelaces. (Tr. 479). Plaintiff had mild difficulty picking up coins, buttoning and unbuttoning, and mild difficulty

with pinch strength in her left hand. (Id.). Plaintiff had full range of motion in her shoulders, elbows, knees, and hips, but she had some limitations in her wrists, lumbar spine, and cervical spine. (Tr. 482-83).

In January 2014, Dr. Ananda DeSilva examined Plaintiff. (Tr. 516-18). Plaintiff complained of hand pain with associated symptoms including decreased mobility, joint tenderness, locking, weakness, and tingling in the arms. (Tr. 516). Plaintiff described the pain as a ten out of ten, but said it was relieved by over-the-counter medicines. (Id.). Dr. DeSilva recommended Plaintiff "exercise moderately" to help with weight management and prescribed a pain spray, naproxen, and Tramadol. (Tr. 518).

Plaintiff visited SSM DePaul Health Center in February 2014. (Tr. 376). Dr. Monu Khanna diagnosed Plaintiff with hypercalcemia and prescribed Tylenol, Norvasc, Floricet, and hydralazine. (Id.). At a second visit in February 2014, Dr. Khanna diagnosed Plaintiff with accelerated hypertension and prescribed Flexeril. (Tr. 375).

Plaintiff followed up with Dr. DeSilva later that month. (Tr. 512-515). Plaintiff's physical exam showed a "normal range of motion, muscle strength and stability in all extremities with no pain on inspection[.]" (Tr. 515). Dr. DeSilva advised Plaintiff to "exercise moderately" and updated Plaintiff's medications to Imitrex, losartan-hydrochlorothiazide, prochlorperazine maleate, pantoprazole sodium, and Norvasc. (Id.). An x-ray of Plaintiff's right hand revealed early arthritic spurring at the dorsal aspect at the base of the third middle phalanx at the level of the "third PIP joint." (Tr. 527).

In April 2014, Plaintiff saw Dr. DeSilva for back pain and hypertension. (Tr. 507-11). Plaintiff complained that her back pain was worsening and persistent with no relief. (Tr. 507). Dr. DeSilva's exam revealed tenderness in the cervical spine with mild pain with motion, muscle

spasm in the lumbar spine with a mildly reduced range of motion, arthralgia in the left pelvis, and mild pain with motion in the left hip and knee. (Tr. 510). Plaintiff returned to Dr. DeSilva's office in June 2014 complaining of discomfort and right side pain. (Tr. 503-06). The physical exam revealed a muscle spasm in the lumbar spine and mildly reduced range of motion. (Id.).

Upon Dr. DeSilva's referral, Plaintiff met with Dr. Guodong Li, at the Barnes Jewish Pain Management Center for sciatica and low back pain in November 2014. (Tr. 54-62). Plaintiff described her pain as "continuous, throbbing, shooting, cramping, gnawing, aching, heavy, tender, tiring-exhausting, [and] sickening[.]" (Id.). She stated that her pain was aggravated by walking, standing, sitting, lying, straining, and environmental factors, such as stress and temperature changes. (Id.). Plaintiff reported she had problems with walking, dressing, falling, bathing and grooming, and daily activities such as cleaning, cooking, and shopping. (Tr. 58). The physical exam showed an antalgic gait, strength at a five out of five, a decreased range of motion of the cervical spine, a paraspinous muscle spasm, tenderness at the lumbosacral region, and decreased lumbar spine range of motion. (Tr. 55-56). In December 2014, Plaintiff returned to Barnes Jewish Pain Management and saw Dr. Michelle Ge for a lumbar epidural steroid injection at L5-S1 to treat L5-S1 central canal stenosis. (Tr. 63-75). Dr. Ge did not alter Plaintiff's medications. (Tr. 65).

In March 2015, a bone density test of Plaintiff's lumbar spine revealed normal bone density of the lumbar spine. (Tr. 16). An MRI of the spine showed grade I spondylolisthesis at L4-5 with mild central stenosis and moderate facet arthropathy, minimal grade I spondylolisthesis at L5-S1 with small annular fissure and facet arthropathy, and no lumbar disc herniation. (Tr. 18-19). In late March 2015, Dr. Ravindra Shitut performed spine surgery on Plaintiff. (Tr. 37).

*C. The ALJ's Determination*

The ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520 and § 416.920[4] and found that Plaintiff: (1) had not engaged in substantial gainful activity since October 24, 2012; (2) had the severe impairments of degenerative disc disease of the lumbar spine, hypertension, arthritis, a history of reflux, posttraumatic stress disorder, borderline personality disorder, and polysubstance abuse in remission, and the non-severe impairment of seizure disorder; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR. § 404, Subpart P, Appendix 1. (Tr. 115-16). The ALJ noted Plaintiff complained that her impairments limited her "ability to perform basic work functions such as standing, walking, sitting, lifting and carrying." (Tr. 118). The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" but her "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely credible." (Tr. 120). The ALJ reasoned that Plaintiff was not entirely credible because her daily activities were inconsistent with her complaints, she had a sporadic work history, and she made inconsistent statements regarding her past drug use. (Tr. 122).

The ALJ found that Plaintiff retained the residual functional capacity (RFC) to:

> perform a reduced range of light work, except that she is limited to work that can be learned in 30 days or less; she may frequently climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; never climb ladders, ropes, or

---

[4] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

scaffolds or balance; and she must avoid concentrated exposure to loud noise, vibration, and hazards.

(Tr. 123). The ALJ noted that the RFC was consistent with the assessment of the single decision-maker contained in the October 2013 Disability Determination Explanation forms that accompanied the SSA's denial of Plaintiff's applications.[5] (Tr. 122). The ALJ acknowledged that the single decision-maker's opinion "can only be considered as an adjudicatory document," and further noted that his RFC was consistent with the findings of the consultative examiner, Dr. Tharenos. (Id.). Citing Dr. Tharenos' evaluation, Plaintiff's medical records, Plaintiff's testimony, Plaintiff's activities, and Plaintiff's lack of credibility as to the "severity or frequency of her symptoms[,]" the ALJ found there was "no basis for finding that the claimant has suffered any other symptoms that would further reduce the residual functional capacity described above at any time through the date of this decision." (Tr. 123).

Based on the testimony of the vocational expert, the ALJ determined that Plaintiff would be able to perform her past jobs as cashier and cleaner. (Tr. 123). The ALJ further found that if Plaintiff's RFC included additional limitations to "only occasional contact with the general public and independent decision-making, no more than occasional changes in the work environment and without strict production pace rate, the claimant could still perform her job as a cleaner [as] it is actually and generally performed." (Id.).

---

[5] The single decision-maker's decisions on Plaintiff claims are at Tr. 181-208. The single decision-maker found that Plaintiff could: occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk six hours in an eight-hour work day; sit for six hours in an eight-hour work day; push or pull unlimited amounts, with the exception of the lifting limitations; frequently climb ramps or stairs; never climb ladders, ropes or scaffolds; never balance; occasionally stoop, kneel, crouch, or crawl; and not have concentrated exposure to noise, vibration, or hazards. (Tr. 188-90, 202-04).

### *III. Standard of Judicial Review*

The court must affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole. Buford v. Colvin, 824 F.3d 793, 795 (8th Cir. 2016); 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, the court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### *IV. Discussion*

Plaintiff claims that the ALJ erred because: (1) the ALJ relied too heavily on the opinion of the single decision-maker; and (2) substantial evidence did not support the RFC. Respondent counters that: (1) the ALJ merely agreed with the single decision-maker's assessment after

evaluating the entire record; and (2) there is substantial evidence to support the ALJ's RFC determination.

### A. Single Decision-Maker

A single decision-maker is a disability examiner authorized to adjudicate cases without mandatory concurrence by a physician. See 20 C.F.R. §§ 404.906, 416.1406; Shackleford v. Astrue, 2012 WL 918864, *3 n. 3 (E.D. Mo. Mar. 19, 2012). Single decision-makers are not acceptable medical sources upon which an ALJ may rely under the Social Security regulations. See 20 C.F.R. §§ 404.1502, 404.1513, 416.902, 416.913. See also Lockwood v.Colvin, 627 Fed.Appx. 575, 574 (8th Cir. 2015) (unpublished per curiam opinion) (upholding the district court's rejection of the Plaintiff's claim the ALJ had to explain the weight given to a single decision-maker because a single decision-maker is not an acceptable medical source); Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir. 2007) (reversing ALJ's denial of benefits because ALJ weighed the opinion of the single decision-maker "under the rules appropriate for weighing the opinion of a medical consultant[.]").

Where an ALJ mentions the single decision-maker's opinion and reaches the same conclusion, it does not follow that the ALJ improperly relied upon the single decision-maker's opinion. See Nicholson v. Colvin, No. 4:12CV1387SNLJ/LMB, 2013 WL 4058243, *14 (E.D. Mo. Aug. 12, 2013). "Reliance on an opinion from a non-medical consultant is only reversible error when it is clear that (1) the ALJ essentially adopted the limitations set forth in the opinion, and (2) no other evidence supports those limitations." Lockhart v. Colvin, No. 13-3151-CV-S-DGK-SSA, 2014 WL 3519099, at *4 (W.D. Mo. July 16, 2014). See also Peak v. Astrue, No. 11-3151-SSA-CV-S-MJW, 2012 WL 219498, at *3 (W.D. Mo. Jan. 25, 2012) (ALJ did not err in

giving "some weight" to the single decision-maker's opinion when context shows the ALJ knew it was not a medical opinion and the ALJ did not rely on it).

Here, the ALJ did not rely upon the single decision-maker's findings. The ALJ merely noted that the RFC was consistent with the single decision-maker's findings and acknowledged that the single decision-maker's "opinion [could] only be considered as an adjudicatory document[.]" (Tr. 122). The ALJ further explained that he found the single decision-maker's RFC assessment to be "consistent with the findings of the consultative examiner[,]" Dr. Tharenos. (Id.). In concluding the analysis, the ALJ explained "the record as a whole, including the overall evidence of the record, the medical evidence, [Plaintiff's] testimony, [Plaintiff's] activities and other factors described above" combined with his credibility determination supported his RFC assessment. (Tr. 123). Based on the Court's review of the record and the ALJ's decision, it is clear that the ALJ understood that a single decision-maker is not an acceptable medical source and did not rely on the single decision-maker's opinion.

*B. RFC*

With regard to the ALJ's RFC determination, Plaintiff also asserts that the ALJ did not adequately account for Plaintiff's spinal stenosis and limited range of motion. Respondent counters that the ALJ considered all medical evidence available at the time and properly determined that Plaintiff maintained the capacity to do a range of light work.

The RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. §§ 404.1541(a)(1), 416.945(a)(1). See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). A claimant bears the burden of persuasion regarding disability and demonstrating his or her RFC. See Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical

records, observations of treating physicians and others, and an individual's own description of limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted). In cases where symptoms such as pain are alleged, the ALJ must include in the determination of the RFC a discussion of the objective medical evidence and the claimant's complaints, resolve any inconsistencies in the evidence, and "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

Plaintiff contends the ALJ ignored evidence that substantiates her claims of disabling pain, including a series of doctor's visits between January 2014 and March 2015, culminating in a surgery on March 25, 2015, approximately eight months after the ALJ's decision. While the ALJ's opinion did not detail her medical records from March 2014 to the decision date, July 24, 2014, those records were consistent with earlier records the ALJ discussed in his opinion. By detailing medical records from July 2011 through 2013 that document Plaintiff's spinal stenosis and limited range of motion, the ALJ adequately evaluated and discussed the objective medical evidence of Plaintiff's RFC. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted.") (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)). Furthermore, the ALJ included limitations on Plaintiff's ability to perform certain movements in the RFC — such as only occasionally stooping, kneeling, crouching, or crawling — that accommodated Plaintiff's restrictions resulting from her spinal stenosis and limited range of motion. McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011) ("We review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation.").

Finally, the Court notes that much of the evidence upon which Plaintiff relied to support her argument that substantial evidence did not support the RFC was dated after the ALJ's decision. 20 C.F.R. § 404.620 (an application is effective through the date of the ALJ's decision). The SSA Appeals Council considered this evidence and concluded: "[I]t does not affect the decision about whether [Plaintiff was] disabled beginning on or before July 24, 2014." (Tr. 2). See Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (new evidence is not "material" when it "merely detail[s] after-acquired conditions or post-decision deterioration of a pre-existing condition."). As Plaintiff did not challenge the SSA Appeals Council's finding that the records were not probative of Plaintiff's condition prior to the date of the ALJ's decision, the Court will not consider evidence submitted after the ALJ's decision of July 24, 2014.

Accordingly, the Court concludes that substantial evidence supports the ALJ's RFC assessment, which properly accounted for Plaintiff's pain, spinal stenosis, and limited range of motion during the time relevant to the ALJ's decision. "If substantial evidence supports the Commissioner's conclusions, [a] court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007).

## *V. Conclusion*

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of August, 2017